Good morning, your honors. May it please the court, I'm John Curtin, appearing on behalf of Madison Power and her family. I'd like to begin this morning by tugging at a thread that I think unravels the district court's grant of summary judgment, and that's the issue of waiver. In this case, the court determined that the plaintiff had waived both the First Amendment retaliation claims and the equal protection discrimination claims under 1983. Now, the district court specifically noted that had it not deemed those claims waived, the result might have been, very well have been different. And that waiver becomes the sole basis for dismissing those claims as against Coach Gonzalez. Now, it would be one thing if the defense in this case had made the argument and that argument had been ignored in the response. What happened here, really, was that the defense made an argument common to all of those claims. In other words, that there was no retaliation and that there was no deliberate indifference. So, counsel, if the retaliation claim was based on the same events as the Section 1983 claim, then does it matter about the waiver because the outcome would have been the same under the analysis of the facts? No. And this is exactly why I say this is the loose thread that unravels it. We have a difference in situation here because we have an individual defendant who is a direct actor and then remaining defendants, including the institutional defendant, that have supervisory liability. But the same set of facts. The same set of facts. The same set of facts. Different theories of liability. Yes. So we could look at the facts and determine whether or not there's deliberate indifference for Section 1983 liability. We can look at those same facts and determine if there's First Amendment retaliation under noble review. You are in a position to make that determination, yes, Your Honor. My point is this. Deliberate indifference is the standard with regard to supervisory liability. With regard to Coach Gonzalez, that's not the case. And with regard to Coach Gonzalez, there is evidence, as the district court alluded to in its footnote, that, you know, Madison Power engaged in protected speech on an issue of public concern, and she was retaliated against. And she said that retaliated. How was she retaliated against? I know there were some offensive remarks, so I don't want to minimize or trivialize those remarks. But there's got to be adverse action or some disparate treatment, and I'm not seeing it. Well, and discrimination under Title IX, really equal protection, amount to the same thing. Retaliation is discrimination. But what were the acts of retaliation? Yes, okay. Within hours of this occurring, the coach began calling members of the team and essentially taking a confidential matter and making it public. She barred Madison from participating in the summer program. Where's the evidence of that in the record? It's in the brief, Your Honor. I'm sorry, but I have a great difficulty here. The witnesses are five teenage girls, and I confess that substituting for my partner in this argument, I'm unable to remember which one is which in terms of who said that. But there was testimony from Madison Power that she wasn't able to participate in the summer program. But that's a different thing than saying it was the coach who barred her from participating. Not being able to participate doesn't necessarily translate to the coach barred me from participating. Well, the coach was actually reprimanded for having made the comment that Madison Power should never have the nerve to show her face in my gym again. And that was made in front of another parent. But in terms of, you know, what she suffered by way of retaliation, she suffered essentially the creation of a hostile environment in which she was physically assaulted. People were trying to trip her on the bus. They were trying to trip her in the hallway. She was called vile names. She was taunted during games. But there's no evidence Ms. Gonzalez directed that or authorized it, is there? Well, I think the motivation for it, though, is very clear. I mean, this is a popular high school coach. Her husband got fired. She obviously bore, and I think admitted that she bore, a grudge against Madison Power. And in dealing with this situation, and this goes to the issue of deliberate indifference as well, in dealing with the situation, the one thing that Coach Gonzalez never did was say Madison Power was right. She had an absolute right to make this complaint against the husband. The school board determined it. You know, she was not a liar. Instead, essentially what the coach did was present to the team the notion that this child was a liar. And she continued to hold that position. And the delegated representative of the district, Schiano, the athletic director, was aware of this. So as we move to the issue of deliberate indifference, we basically have the hen guarding or the fox guarding the hen house, okay? The primary point of contact with the team members who are known to be or are repeatedly confirmed to be abusing this child is the very person most likely to hold a grudge under the circumstances. This is a difficulty that the district created when it ignored its own nepotism policy, because it created a situation in which the head coach is the person most offended by this situation. And we then take the person most offended by this situation and leave them as the point person for dealing with the team members. And it doesn't work. And it's brought to the attention of Schiano, and he's repeatedly informed, this is not working. I agree that it's truly unfortunate that this young lady had to endure these problems while she was in high school. The difficulty is the level of proof that's required and the evidence that was presented in the summary judgment to support the assertions that the coach instigated the incidents. I think there is sufficient evidence that the girls tormented her, but I think there's a scarcity of evidence regarding the involvement of the coach. Well, we do have evidence that the coach, for example, assigned one of the team members to basically check up and report on the powers. We do not, and I agree, have evidence that the coach directed the players to harass Madison Powers, but we also have evidence that the coach essentially permitted it to happen. And when I say that, what I mean is effective intervention here at a minimum would have been to tell these girls who resented the idea that Madison Powers lied and that her lying caused the firing of Josh Gonzalez, that that didn't happen. Well, but was there any law or regulation that required that to happen? I think what the law requires, ultimately, is that where somebody engages in protected speech, where someone complains of discrimination, that they be protected from retaliation in an effective way. And that's precisely the problem here, again, is that even when Coach, or when Administrator Schiano, when it's drawn to his attention by another teacher, when it's drawn to his attention by Madison Power and witnesses, that she is still being harassed, he basically tells the teacher, well, you know, this is something that she's just going to have to tough out. This is something that she's just going to have to cope with if she wants to play basketball. I think he said, have to deal with head on. In other words, it's her problem. So here is the person who is the delegee of the district, exhibiting deliberate indifference to the situation, saying, I'm not, I know this remedy is not working, and I'm not going to intervene. I admit that the school district did investigations of complaints, but investigations aren't a remedy. Madison Power engaged in protected speech, she complained of discrimination, she had a right to do so, and she had a right to be protected in doing so. We're at the summary judgment stage on this case. And summary judgment really should not rest upon the judge essentially making determinations of fact. Is the conduct sufficiently objectively offensive? I think the judge there is focusing on the wrong aspect of that test. The test ultimately is, was she effectively denied access to programs? Well, she was driven out of her senior year of basketball. She was unable to submit an application for college basketball, because she didn't have a varsity head coach to endorse that for her. And she was tormented, and she was tormented over a period of two and a half years. So it was persistent and severe and rose to the level of physical assaults. That's a question of fact that a jury ought to hear. Likewise with the deliberate indifference, as I think I've already explained our position on that fully. And if ineffective, ignoring the fact that your remedy is ineffective is deliberate indifference. I think we have the argument in hand. Do you want to save some time for rebuttal? Yes. Yes, I would, Your Honor. Thank you. Morning. May it please the Court. My name is David Powley. I am appearing this morning on behalf of Gilbert Public Schools as well as various employees of this school district. I'd like to address kind of what I was hearing in the opening remarks. Opposing counsel essentially bypassed all of the issues that the district court addressed and resolved to get to an issue that the district court didn't even reach, because before it even got there, it had already determined that all of the claims should be dismissed  So if I can, let me back up a little bit and address the issues that the district court covered and resolved in granting the motion for summary judgment. We're dealing essentially with two separate claims. We have the Title IX claim against the school district, which has been the claim that the powers have featured at every stage of the litigation. And then the second category is kind of a grouping of constitutional claims. On the Title IX claim, the district court's decision is a direct product of the Supreme Court's decision in Davis. The reason why the Title IX claim is not viable in this case is because the school district was not deliberately indifferent to known acts of harassment and retaliation. Every time an incident or a situation was brought to the attention of the district administration, they investigated. And after they investigated, they took action based on their findings. I can give you several examples. With Josh Gonzalez, as soon as that report was made and the district investigated, the district severed its ties with Josh Gonzalez. Well, not immediately. It was immediately. What happened was it occurred during the season in December of 2005. It was a holiday tournament. It was not reported to the district administration until after the basketball season was over. That was late March of 2006. It was within a matter of days that the district opted not to renew the coaching contract of Josh Gonzalez. So he worked through the rest of the school year. He had already completed the contract, his coaching contract, for that year. The only question was, was he going to return for the coming season? So he wasn't a teacher there or anything? He wouldn't remain at the school? He was a part-time coach only. Okay. In addition, the district disciplined Candace Gonzalez. She was issued a formal reprimand, and much of that was for a comment, an inappropriate comment that she made about Madison to the parent of another player on the team. As part of that reprimand in the letter, which is included as part of the record, you'll see that the district directed her to undergo some additional training. The district also directed that the athletic director, Anthony Scantio, closely monitor the program and that Candace Gonzalez would have a responsibility to confer on a routine and regular basis with Mr. Scantio in terms of the operation of the girls' basketball program at the high school. Did the school violate the district's nepotism policy by allowing Mr. Gonzalez to be the assistant coach? Your Honor, in order to answer that question, I have to go outside the record. What is in the record is that Candace Gonzalez did not request a variance from ñ and it's not called an anti-nepotism policy. It's part of a broader policy that the district has for conflict of interest. But what the record does not establish is that she did not receive a variance from that conflict of interest policy. That is not part of the record. I bring that up because, in fact, she did receive a variance from that conflict of interest policy. Let me also talk about ñ It was against the policy. You had to get a variance. It was against the policy to hire her husband as a coach, right? I'm sorry. It was against district policy to hire her husband as a coach. She had to get a variance for the policy in order to do so, correct? Well, the policy allows for exemptions to be made on a case-by-case basis. But the rule is it's a conflict of interest. I mean, under the ñ if the rule were applied, she should not have hired her husband as an assistant coach. That's correct, unless the district reviewed the situation and made an exemption. Could one say that the district was deliberately indifferent by allowing a variance to permit her husband to coach? I'm not sure how that gets into discrimination under Title IX, though. Because if the district could have foreseen that if there was a conflict with the assistant coach, there really is no viable method of resolving that if the person you go to is the assistant coach's wife. And I think that gets away from the Title IX standard, which is known acts of harassment or retaliation. Because deliberate indifference is what it is. Deliberate indifference to members of the same family working together? Deliberate indifference to the right of the student to go to school and to participate in extracurricular activities free of gender-based harassment. I see that as a leap, though. You're talking about ñ for that to be true, I guess every school district would have to assume that if you have two family members who work on the same campus or work in proximity, that they're going to engage in gender discrimination. Well, that's why you have conflict ñ that's why you have nepotism policies, to avoid the eventuality that, you know, people who have conflicts of interest having to decide issues. Those issues with coaches are not unique. They're not new. They arise in a lot of circumstances. And so it would be prudent not to have that type of relationship. And that's why the conflict of interest regulations and rules exist. So my question is, could it be considered deliberately indifferent for the school to allow that situation to occur? And I guess, again, I don't dispute the wisdom of the policy. And certainly that's why the district had the policy. Although it wasn't a blanket policy, it allowed for a review of particular situations and a possible exemption by the district administration. But I still think it's a large leap to go from the notion that two members of a family working on the same campus ñ Not working on the same campus. ñ or even working together with a certain program or a certain class is going to result in some kind of discrimination of any kind, let alone gender discrimination. I just ñ I'm not sure I see a real connection there without making a very huge leap in terms of, you know, foreseeing and predicting the future. Title IX is a specific statute. It deals only with athletics. And so this is a unique environment where you're going to have coaches. So it's a little different than saying someone on the same campus. It's strictly limited to the athletic arena. Actually, my reading of Title IX is a little broader. It applies to any educational program. Well, that's true, too. But generally the cases concern athletic endeavors. Yes. A lot of the Title IX cases do resolve around issues of equality between men's athletics and women's athletics. Yes. Anyway, go ahead. The question isn't that much of a leap if the district had knowledge that the assistant remarks and nevertheless allowed him to coach. And there's no evidence in this record that the district had any prior knowledge that this assistant coach was a problem. Yes, that is the record. Not until March 30 or 31 of 2006 when Madison Powers finally came forward and met with the principal and the assistant principal. And as I said, the district's response was almost immediate in telling Josh Gonzalez that he would not be returning as a coach in any capacity. But there's evidence in the record that this was not the first time that there had been inappropriate comments made by Mr. Gonzalez. There were a couple of students, that is correct, Your Honor, that came forward and said that they had heard previous comments. Now, as far as Madison was concerned, this is the first and only time that she ever heard Josh Gonzalez make such statements. But the other thing that is clear from the record is that the district, again, the standard under Title IX is known acts of harassment or retaliation. The district had no knowledge of those prior incidents. That was news to members of the district and its administration. One other thing I wanted to mention, we've talked a little bit about staff-to-student retaliation harassment. Let me also mention the district's response in terms of student-to-student harassment. Whenever a situation was brought to the attention of the administration involving a particular student, the district always investigated those situations and intervened even when the students who had been accused of being involved in this denied any involvement. One example of this would be the allegation that two students had stepped on the back of Madison's flip-flop in a crowded hallway. Madison came into the assistant principal's office. He, after hearing her report, went immediately to the school's security cameras to see if he could verify any of it. He wasn't able to do that, so he brought in the students. He spoke to them. Now, they all denied their involvement, so they all felt understandably unjustifiably accused and implicated in the situation, and yet the district still intervened. These girls were brought into the assistant principal's office. The assistant principal called and notified their parents of the report, and then the girls were given direct instruction that if they were ever to find themselves in proximity to Madison on campus, that they needed to remove themselves. They needed to keep their distance from Madison. The other thing I wanted to mention is that it wasn't just a reactionary approach by the district. They were very proactive in handling the situation. I think the best example of this would be the tryouts in 2006. That would have been Madison's junior year of high school. Candace Gonzalez voluntarily recused herself from any involvement or participation in selecting the teams that year, freshman and junior varsity teams. The other thing was the school administration, and not just the school administration, the district administration were out in force at the tryouts. You had the assistant principal there. I'm sorry, the assistant superintendent and the superintendent. Their appearances at the tryouts was unprecedented. They had never done that before. You really can't make a jury argument here. I mean, this is a summary judgment. If we have disputed facts, we construe them in the light and most favorable to the plaintiff. So I'm not quite sure where you're headed with it, but you only have three minutes left. I suggest you turn to your legal arguments. Okay. Well, just to loop that back into the legal argument, it has everything to do with the standard under Title IX. I mean, you're arguing it's unprecedented. It's this. I mean, that's not for us to decide. It's for a jury to decide if we get that far. So it seems to me you're kind of damaging your case by arguing the facts instead of the law. Your Honor, respectfully, it just goes to the legal standard under Title IX, which is deliberate indifference. And the Davis decision makes it very clear that it's a decision that's a type of standard that can easily be handled by district courts on a summary judgment motion, a motion to dismiss, a direct conversion. Undisputed facts. Undisputed facts. Viewing the facts to the light and most favorable to the plaintiff. So it's not for us to decide whether this is unprecedented and how much weight to give that, for example. That they all showed up. Right. And what I would add is that those facts are undisputed. But there was also an assertion that one of the teachers who was a supporter of the plaintiff was not allowed to go into the gym. So recitation of those facts does nothing for you because there is a fact to the contrary. And so if there's a fact to the contrary, it's weighed in favor of the plaintiff. Agreed. And on that issue, that factual issue, that teacher was allowed to attend the full tryouts on day one. Well, see, now you're getting into disputed issues of fact. We have to construe it in favor of, unless it's undisputed. That is undisputed. The teacher was there. That teacher was there for the entire first day of the tryouts. It wasn't until the second day that she was asked not to return. Okay. Talk about the equal protection claim. The district court rejected the equal protection claim because there's no authority saying you can state an equal protection claim based on retaliation. Correct. Is that right as a matter of law? Well, it is an issue of, as far as I can tell, it's an issue of first impression here in the Ninth Circuit. But as you survey the legal landscape, what you'll find, what I found, is over a dozen opinions from sister circuits, First Circuit, Second Circuit, Third, Seventh, Tenth, Eleventh. These circuits have repeatedly declined to break new constitutional ground and recognize retaliation as a basis for an equal protection claim. And so there is no legal authority. And as far as I can tell, all of the legal authority on that issue is to the contrary and supports the decision of the district court to dismiss an equal protection claim, at least one that's based on allegations of retaliation. Well, I'm not sure I agree with you that the authority to the contrary is extensive. But I realize there is some authority to support what you're saying. But I still don't understand. Why can't retaliation be an equal protection violation? It would seem to me that if you're retaliating against someone for complaining about being sexually harassed, that that's just as bad, if not even worse. That's adding injury to insult. Right. And as best I can tell from the legal authority that is existing in the sister circuits, equal protection is concerned with particular types of classifications that are well-known, race, national origin. Gender also happens to be what's referred to as a quasi-suspect classification. But the allegation here is not that Madison Power was retaliated against because she's female. That's not part of the classification that's involved here. The classification is that she was retaliated. The allegation is that she was retaliated against because she reported some misconduct. And that's not a classification that has ever been recognized under an equal protection analysis. And the difficulty is finding similarly situated people against which to compare the conduct. Yes. I agree with that. In a retaliation rubric. Yes. And for all of the reasons covered, we ask that the panel affirm the judgment of this district court below. Thank you. Thank you, counsel. Mr. Butler. Yes, Your Honor. A couple of quick points. First, to correct the record on the issue of nepotism. If you look at plaintiff's exhibit six in our statement of facts, we have a copy of the policy. And what it states is, no person employed by the district in any capacity may be directly evaluated by a relative. Quote, there shall be no exceptions to this provision. So it was wrong from the inception. Secondly, to respond to the point on equal protection. The authorities that have been cited with regard to the idea that there's no protection for retaliation under the equal protection amendment, largely are cases which precede the decision in Jackson versus Birmingham Board of Education. Now, Jackson is a Title IX case, but what it's not a 1983 case. But what it says is if there's no protection of retaliation for reporting wrongful conduct, then there's no protection against wrongful conduct. In other words, retaliation for reporting discrimination is itself discrimination. But how do you do the analysis? Because generally for an equal protection analysis, we identify similarly situated people and see if there was equality of treatment. So how do we perform that analysis in a retaliation context? Well, I guess I would say that retaliation is somewhat different. If you're treated differently than everybody else is because you made a complaint, then that's your equal protection analysis. In other words, you compare that with the baseline. You're not comparing this person with other people who have made complaints. Were they retaliated against? Were they not? You're comparing it with other students in the school. Was this person treated in a disparate fashion following a protected? That's not equal protection analysis, though. Well, I guess, and I will concede that the Ninth Circuit has not addressed this issue yet. I think there are some unpublished district court opinions out there that address this. But for terms of equal protection, it seems to me there's no principled reason to make a distinction between retaliation being discrimination under Title IX and retaliation being discrimination and a violation of equal protection. If discrimination is protected under equal protection, then retaliation ipso facto needs to be protected as well. Next point, what did the coach do? What the coach really did here, when you look at it, is it was predictable because of the nepotism situation. She set the ball in motion. She called and said Madison's a liar. The case depends on inference. What? At this point, your case depends on inference, inferential reasoning. That's not quite true, Your Honor. There is testimony, a plaintiff's statement of facts in paragraph 77, 78, that Candace Gonzalez called Brittany Foster and essentially did deny. Josh would never say anything like that. So she told Brittany Foster very early on, Madison is lying. And you can see the seeds of this when she talks to Mr. Schiano later in this case. Mr. Schiano says. When I say inferential, I think I understand your case. But at the end of the day, you don't have direct evidence that the coach goes out and tells you. She didn't say go hard fall her, trip her on the bus. She may have said something like, you know. She expressed. Well, no, it may have been Ms. Metelson-Priest or something. Exactly. She set the ball in motion and let her public depression, displeasure with Madison be known. She let the team essentially know Madison Power is responsible through her lies for causing the firing of an otherwise popular coach and my husband. And I'm not happy about it. And I'm your authority figure that you look up to. Now, final point, if I could, Your Honor. The tryouts, I think, are the significance of the tryouts. And you're absolutely correct. This is all disputed fact. The significance of the tryouts is that it's essentially an admission by Coach Gonzalez that she was unable to treat Madison Power fairly. She had to recuse herself because of her resentment towards this trial. But then she deferred the decision to essentially people under her supervision. That really doesn't improve the situation. Summary judgment shouldn't be based on a shaky waiver where the defendant didn't even argue the First Amendment issue, didn't argue the equal protection discrimination issue. And because of the fact that Coach Gonzalez is differently situated and we need not show disparate impact with regard to Coach Gonzalez's conduct, they would not have been entitled to summary judgment. Absent the Court's determination of waiver. Thank you, Your Honor. Thank you, counsel. The case to serve will be submitted for decision. Thank you both for your arguments.
judges: Carney, Thomas, Rawlinson